In re ANR ADVANCE TRANSPORTATION COMPANY, INC., Debtor.

David F. Loeffler, on behalf of himself and on behalf of Attorney Thomas P. Krukowski, Attorney Elizabeth A. McDuffie, the law firm of Krukowski & Costello, S.C., and Robert G. Turcott, former in-house general counsel of ANR Advance Transportation; and Kravit, Gass, Hovel & Leitner, S.C., Appellants,

v.

Bruce A. Lanser, as Chapter 7 Trustee of ANR Advance Transportation Company, Inc., and Central States, Southeast and Southwest Areas Pension Fund, Appellees.

No. 03–C–101.
Bankruptcy No. 99–22155–JES.

United States District Court,
E.D. Wisconsin.

Dec. 12, 2003.

David F. Loeffler, Krukowski & Costello, Timothy C. Kamin, Krukowski & Costello SC, Leonard G. Leverson, Kravit, Gass, Hovel & Leitner, Milwaukee, WI, for Appellants.

Timothy F. Nixon, LaFollette, Godfrey & Kahn, Madison, WI, John J. Franczyk, Jr., Central States Southeast & Southwest Areas Pension Fund, Rosemont, IL, for Appellees.

## DECISION AND ORDER

ADELMAN, District Judge.

David F. Loeffler and Kravit, Gass, Hovel & Leitner, S.C. (the "law firms" or

"appellants"), previously represented ANR Advance Transportation Company, Inc. ("ANR" or "the debtor"), a corporation presently involved in a Chapter 7 bankruptcy proceeding in this district. The law firms appeal from an interlocutory order of the bankruptcy court granting a joint motion of the trustee in bankruptcy, Bruce Lanser ("trustee"), and the Central States, Southeast and Southwest Areas Pension Fund ("Central States"), a multi-employer pension fund and creditor of ANR. The interlocutory order authorized the trustee to waive work product immunity with respect to material possessed by the law firms as the result of their representation of ANR.

## I. FACTUAL AND PROCEDURAL BACKGROUND

ANR, a unionized trucking company, was formed in 1996 when ANR Freight Systems, Inc., merged with Advance Transportation Company. The Coastal Corporation ("Coastal") owned 100% of ANR Freight Systems, Inc., but only fifty percent of the newly formed entity, ANR. Subsequently, ANR experienced a strike, became financially troubled, and ceased making contributions to the employee pension fund.

In February 1999, ANR's creditors filed an involuntary bankruptcy petition under Chapter 11 in federal bankruptcy court in Delaware. The court entered an order for relief under Chapter 7 and transferred the case to this district.

When ANR stopped contributing to the pension fund, it became subject to liability for its share of the unfunded portion of the plan, i.e., withdrawal liability. Central States filed a claim against ANR exceeding $20 million in the bankruptcy proceeding.

Additionally, under the Employee Retirement Income Security Act of 1974

("ERISA"), as amended by the Multi–Employer Pension Plan Amendments of 1980 ("MPPA"), liability for withdrawal payments can be allocated to an entity which owns at least 80% of the stock of the debtor. 29 U.S.C. §§ 1001–1461. Moreover, if such entity reduces its ownership interest for the purpose of avoiding its obligation to make withdrawal payments, it remains subject to withdrawal liability. 29 U.S.C. § 1392(c). Thus, if it could be established that the purpose of the 1996 merger was to enable Coastal to evade withdrawal liability, Coastal would be jointly and severally liable with ANR to Central States. This would benefit both ANR and Central States.

Thus, the trustee and Central States sought to establish that the purpose of the merger was to enable Coastal to avoid withdrawal liability. Counsel for Central States advises that Central States's employees searched ANR's records but uncovered no evidence concerning the reason for the merger. Although the law firms apparently did not represent ANR at the time of the merger, the trustee and Central States believed that they might possess information relevant to the possible withdrawal liability claim against Coastal. However, the law firms indicated that they would assert work product immunity in response to any request for information or materials from the trustee. Therefore, the trustee and Central States brought a joint motion in the bankruptcy court seeking court approval of the trustee's waiver of work product protection. The law firms opposed the motion.

On December 19, 2002, the bankruptcy court granted the motion relying heavily on *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). There, the Supreme Court considered the question of who controls the attorney-client privilege

of a corporation in bankruptcy or, more specifically, whether the power to waive the attorney-client privilege with respect to pre-bankruptcy communications remains with the corporation's directors or passes to the bankruptcy trustee. *Id.* at 349, 105 S.Ct. 1986. Likening the transfer of control to a trustee to a change of company management, the Court held unanimously that the power to waive the attorney-client privilege on behalf of the corporation passes to the trustee. *Id.* at 354, 105 S.Ct. 1986.

The Court pointed out that in a bankruptcy proceeding the debtor's directors "retain virtually no management powers [and, therefore,] should not exercise the traditional management function of controlling the corporation's attorney-client privilege unless a contrary arrangement would be inconsistent with policies of the bankruptcy laws." *Id.* at 353, 105 S.Ct. 1986 (internal citation omitted). The Court found that permitting the trustee to control the corporation's attorney-client privilege was consistent with the policies of the bankruptcy statute of "maximiz[ing] the value of the estate," *id.*, and of enabling the trustee to "investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors," *id.* The Court further stated that to allow the directors of the corporation to have the power to waive the attorney-client privilege would "frustrate [this] important goal of the bankruptcy laws." *Id.*

In the present case, the bankruptcy court ultimately concluded that:

> The trustee has the power to waive the debtor's attorney-client privilege and the work product immunity in order to assist a creditor (meaning, in this case, Central States) in determining whether a third party may be jointly and several-

ly liable for a claim that the creditor has against the debtor.

> In addition, an attorney may not assert work product immunity and thereby prevent its disclosure, where the client has waived such work product immunity and is seeking access to the work product for the client's own benefit.

> The joint motion of the trustee and Central States for an order approving the trustee's waiver of the debtor's attorney-client privilege and work product privilege is **GRANTED**.

*In re ANR Advance Transp. Co., Inc.,* 288 B.R. 208, 212–13 (Bankr.E.D.Wis.2002).

The law firms now appeal from the bankruptcy court's order. The parties submitted briefs, and I heard oral argument. During the argument, the trustee stated that he seeks only documents or information relating to the subjects of withdrawal liability, the Central States Pension Fund and the merger that created ANR, and only documents or information that the law firms communicated to a third party.

## II. JURISDICTION AND APPLICABLE LEGAL STANDARDS

### A. Interlocutory Appeal from Bankruptcy Court

Pursuant to 28 U.S.C. § 158(a), district courts have jurisdiction to review certain decisions of bankruptcy judges and may also hear appeals from certain interlocutory orders. Generally speaking, leave to appeal an interlocutory order will not be granted "absent exceptional circumstances." *Escondido Mission Vill. L.P. v. Best Prods. Co., Inc.,* 137 B.R. 114, 116 (S.D.N.Y.1992). In determining whether to hear an interlocutory appeal pursuant to § 158(a), courts have traditionally turned to 28 U.S.C. § 1292(b)—the general inter-

locutory appeal standard—for guidance. *In re Pullman Constr. Indus., Inc.,* 143 B.R. 497, 498 (N.D.Ill.1992).

■ Section 1292(b) provides that an appeal of an interlocutory order may be appropriate when "such order involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." In the present case, both parties assert that the conditions set forth in § 1292(b) for hearing an interlocutory appeal are met. I agree. The bankruptcy court's order presents a question of law about which the parties disagree, and it appears that resolution of the issue would materially advance resolution of the bankruptcy proceeding. Thus, I have jurisdiction to hear the appeal.

## B. Case or Controversy

■ Another jurisdictional issue requires brief mention. In its initial brief, one of the law firms argued that, because the trustee had not presented a specific discovery request to the firms, the dispute was insufficiently concrete to satisfy the "case or controversy" requirement of Article III, Section 2 of the United States Constitution. In its reply brief, the law firm changed its position and agreed with the trustee and Central States that the requirement was satisfied. However, federal courts are courts of limited jurisdiction and are obliged to police their own jurisdiction. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 7, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). Thus, I must independently assess whether the case or controversy requirement is satisfied.

■ A case or controversy exists if a party to the suit is engaged in the " 'pursuance of an honest and actual antagonistic assertion of rights ... against [the oth-

er].' " *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 446, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting *Muskrat v. United States,* 219 U.S. 346, 359, 31 S.Ct. 250, 55 L.Ed. 246 (1911)). " '[Where] valuable legal rights ... [would] be directly affected to a specific and substantial degree,' " the requirements of Article III are met. *Id.* (quoting *Nashville, Chattanooga & St. Louis Ry. v. Wallace,* 288 U.S. 249, 262, 53 S.Ct. 345, 77 L.Ed. 730 (1933)).

■ In the present case, the case or controversy standard is satisfied. While work product issues usually arise when a party to whom a discovery request is addressed asserts immunity, a party may also resolve a work product issue via a pre-discovery order. This will typically occur when a party believes that a whole line of discovery may be foreclosed by the work product rule or is aware that another party will assert work product protection in response to a line of discovery requests. *See* 6 James Wm. Moore, *Moore's Federal Practice* § 26.70[5][a] (3d ed.2003); *see also Resolution Trust Corp. v. Dabney,* 73 F.3d 262, 266 (10th Cir.1995) (stating that where party believed work product doctrine might foreclose certain lines of questioning, proper procedure was to apply to court for a pre-discovery order addressing the matter).

In the present case, the trustee and Central States sought to resolve the work product issue by obtaining a pre-discovery order stating that the trustee was authorized to waive immunity. Subsequently, the bankruptcy court issued such an order. Additionally, the trustee has made clear what material and information he seeks, and the law firms have made equally clear that they will not make it available voluntarily. Thus, the dispute is sufficiently

concrete to satisfy the case or controversy requirement.

## C. Standard of Review and Applicable Law

■ The question presented is purely one of law, and I review it de novo. I apply federal law because the work product doctrine is governed by a uniform federal standard. *See, e.g., Dawson v. N.Y. Life Ins. Co.*, 901 F.Supp. 1362, 1367 (N.D.Ill.1995).

## III. DISCUSSION

### A. Relationship Between Trustee and Law Firms

■ *Weintraub* makes clear that the trustee succeeds to the rights of the directors of ANR. It follows that the trustee controls any interest that ANR had in the work product of its attorneys. Thus, the law firms owe the same duty to the trustee as they would to a former client.

### B. General Rule Regarding Access of Former Client to Attorney Files

The dispute arises out of the trustee's request for access to the law firms' files. Thus, before addressing the possible impact of the work product rule on the matter, I will briefly discuss the law concerning the right of a former client to access an attorney's file.

■ The majority rule is that, with narrow exceptions, upon termination of the attorney-client relationship and where no claim for unpaid legal fees is outstanding, the client is presumed to be entitled to full access to the attorney's file on a matter

where the attorney represented the client. *Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn L.L.P.*, 91 N.Y.2d 30, 34, 666 N.Y.S.2d 985, 689 N.E.2d 879 (1997). This rule has been embraced by the *Restatement (Third) of Law Governing Lawyers* § 46(2) (2000), which provides: "On request, a lawyer must allow a client or former client to inspect and copy any document possessed by the lawyer relating to the representation, unless substantial grounds exist to refuse."

■ The minority rule is that "end product" documents, such as filed pleadings, final versions of documents prepared for the client's use, and correspondence with the client, opposing counsel and witnesses, belong to the client, while non-end product materials remain the property of the attorney. *See Sage Realty Corp.*, 91 N.Y.2d at 35, 666 N.Y.S.2d 985, 689 N.E.2d 879. Under this view, the client is only entitled to access to non-end product documents to the extent of a demonstrated need. *Id.*[1]

■ Because even under the majority rule a lawyer may withhold some non-end product documents (e.g., internal memoranda discussing assignment of lawyers, whether the lawyer must withdraw, or possible malpractice liability; or private notes), *see Restatement (Third) of Law Governing Lawyers* § 46 cmt. c, the differences between the majority and minority rules may not be substantial.[2] Regardless, it appears that under either rule the trustee in the present case is entitled to the documents that he seeks.

---

[1] Wisconsin is among the states that follow the minority rule. *See, e.g., Wisconsin Ethics Opinions* E-82-7 (1998).

[2] Under the minority rule, the client may obtain non-end product documents if he or she

can demonstrate a need for them. Thus, both rules contain a number of exceptions, and it may be that the principal difference between them is who bears the burden of showing the need for disclosure/secrecy.

## C. Law Firms Assertion of Work Product Immunity

However, the law firms argue that they need not grant the trustee access to the materials sought because they constitute attorney work product. The trustee responds that because he controls the client's interest in work product, he may waive the law firms' right to claim work product immunity. As previously indicated, the bankruptcy court ruled in favor of the trustee.

Disputes between lawyers and clients about access to work product are unusual. Generally, the interests of lawyers and clients are the same, and it is unnecessary to measure the relative strengths of each's claim to work product. *See* Jeff A. Anderson et al., *The Work Product Doctrine*, 68 Cornell L.Rev. 760, 873 (1983). Thus, there are very few cases that address the issue presented here. In the absence of clear guidance in the case law, I conclude that the best approach to resolving the dispute is to examine the purpose of the work product doctrine and then determine what result best serves that purpose.

 However, before pursuing this inquiry, it is important to point out that not all material or information in the possession of an attorney is work product. Generally, to constitute work product, material must be: (1) a document or tangible thing; (2) prepared in anticipation of litigation; (3) for that party. *Cornelius v. Consol. Rail Corp.*, 169 F.R.D. 250, 253 (N.D.N.Y.1996). Documents prepared in the regular course of a party's business are not protected. *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F.Supp. 491, 513 (D.N.H.1996). Moreover, if a document is prepared for a nonparty to the litigation, work product protection does not apply, even if the nonparty is a party to closely related litigation. *See, e.g., Doubleday v. Ruh*, 149 F.R.D. 601, 605–06 (E.D.Cal. 1993). Additionally, facts are not protected even if contained within a document entitled to protection. *In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y.1997) (finding work product objections to interrogatories requesting facts in support of requesting party's contentions improper because work product protection does not extend to facts).

Thus, in the present case, if the information or document at issue is not work product, the trustee's right of access is governed by the rules regarding client access to attorney files outlined above. *See Sage Realty Corp.*, 91 N.Y.2d at 34, 666 N.Y.S.2d 985, 689 N.E.2d 879; *Restatement (Third) of Law Governing Lawyers* § 46. Assuming, however, that some or all of the material sought by the trustee is work product, I turn to the question of whether such fact makes a difference.

## D. Purpose of Work Product Rule

 In the seminal case of *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court held that an attorney's work product was immune from discovery. The doctrine was partially codified in Fed.R.Civ.P. 26(b)(3), which provides varying levels of protection for different classes of work product, such as ordinary work product, opinion work product and legal theories. Courts and commentators have advanced a number of justifications for the doctrine. It has been said that work product is protected to encourage attorneys to record information, *see Hickman*, 329 U.S. at 511, 67 S.Ct. 385; that discovery of an attorney's work product would lead to sharp practices, *id.;* that immunity is necessary to prevent the unseemly occurrence of a lawyer testifying against his client, *id.* at 516–17, 67 S.Ct. 385 (Jackson, J., concurring); that discovery of work product would prematurely

freeze the issues in a case, *see* Elizabeth G. Thornburg, *Rethinking Work Product*, 77 Va. L.Rev. 1515, 1538 (1991); that discovery of work product would lead to ridicule of lawyers, *Hickman*, 329 U.S. at 516–18, 67 S.Ct. 385 (Jackson, J., concurring); and that discovery of work product would lead to attorney laziness, *id.* at 510–11, 67 S.Ct. 385. *See generally*, Charles P. Cercone, *The War Against Work Product Abuse: Exposing the Legal Alchemy of Document Compilations as Work Product*, 64 U. Pitt. L.Rev. 639, 660–62 (2003).

■ However, it is widely agreed that the principal justification for the doctrine is that protection of work product is necessary to preserve the adversary system of justice. *Hickman*, 329 U.S. at 510–11, 67 S.Ct. 385 ("[I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel."); *In re Sealed Case*, 676 F.2d 793, 809 (D.C.Cir.1982) (stating that work product "looks to the vitality of the adversary system"); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C.Cir.1980) (indicating that the purpose of the work product rule is "to protect the adversary trial process itself"); *In re Grand Jury Proceedings (FMC Corp.)*, 604 F.2d 798, 802 (3d Cir. 1979) (stating that the overriding purpose of the doctrine is to encourage proper functioning of the adversary system); Cercone, *supra*, at 660 (stating that the Supreme Court was most concerned about preserving a zone of privacy for an attorney so that he could perform freely as an adversary and play his critical role in the adversary system).

■ The way in which the work product doctrine preserves the adversary system is by granting attorneys a zone of privacy in which to work. *Hickman*, 329 U.S. at 510–11, 67 S.Ct. 385. The doctrine creates a space in which attorneys can prepare their cases and test their ideas and theories away from the scrutiny of their adversaries. *See, e.g., In re Special September 1978 Grand Jury*, 640 F.2d 49, 62 (7th Cir.1980) (stating that the rule establishes a protected area in which the lawyer can prepare his case free from adversarial scrutiny). Making preparation material routinely available to adversaries could harm the adversary system by allowing attorneys' work efforts to be used against their clients, thereby demoralizing the attorneys, or causing them not to develop documents. *Hickman*, 329 U.S. at 511, 67 S.Ct. 385. Work product immunity also encourages attorneys to be diligent by preventing them from preparing their cases based on their adversaries' efforts and files. Since work product remains confidential, each side will be encouraged to prepare its own case, and the adversary system will function as it was designed to do, i.e., to justly resolve disputes. *Id.; see also* John William Gergacz, *Attorney–Corporate Client Privilege* § 7:10 (3d ed.2001).

■ Thus, while work product immunity may be asserted by either the lawyer or the client,[3] *In re Special September 1978 Grand Jury*, 640 F.2d at 62, it does not serve to protect the interests of any particular individual—plaintiff, defendant *or* counsel. Rather, it is designed to benefit the adversary system itself and to produce an atmosphere in which counsel for both sides can fully prepare and present their clients' best case without the stifling self-editing that would be necessary if an attorney's work product were subject to unchecked discovery. Thus, challenges to claims of work product immunity should be evaluated with the understanding that the purpose of the immunity is to protect the

---

**3.** In this respect, it is unlike attorney-client privilege, which "belongs" to the client.

adversary system. When work product immunity does not serve such purpose, there should be no immunity despite what may best serve individual interests. Sherman L. Cohn, *The Work–Product Doctrine: Protection, Not Privilege*, 71 Geo. L.J. 917, 943 (1983).

### E. Effect of Work Product Doctrine in Present Case

■ In the present case, I conclude that the law firms may not interpose the work product doctrine to deny the trustee access to the material he seeks. To grant the law firms work product immunity under the circumstances present here would not serve the purpose of the work product doctrine. Clients are not adversaries of their lawyers, and the zone of privacy that the work product rule protects was designed to shield lawyers from their opponents, not their clients. *See Research Institute for Medicine & Chemistry, Inc. v. Wis. Alumni Research Found.*, 114 F.R.D. 672, 680 (W.D.Wis.1987) ("The work product rule is designed to protect the lawyer's work from his litigation adversary."). Thus, the doctrine has no applicability in the present context.

Moreover, the effect of denying the trustee access would be to make the law firms less accountable to their client. Non-disclosure in such a situation would prevent the client from discovering whether the attorney had effectively represented it and thus undermine the work product immunity goal of encouraging effective representation of clients. Anderson et al., *supra*, at 874; *see also In re Kaleidoscope, Inc.*, 15 B.R. 232, 240 (Bankr.N.D.Ga.1981), *rev'd on other grounds*, 25 B.R. 729 (N.D.Ga.1982) (holding that trustee in bankruptcy could obtain possession of the bankrupt's legal files from the bankrupt's attorney for purpose of determining,

among other things, whether attorney had charged the debtor reasonable fees).

■ In the present case, the trustee seeks access to the law firms' work product not to assess the reasonableness of the law firms' fees, but to determine whether the reason for the merger that created ANR was to enable ANR's parent corporation to avoid withdrawal liability. If the law firms advised ANR or its parent that the parent could avoid withdrawal liability through such a merger, it may be that the law firms did not effectively represent ANR because it would not have been in ANR's interest to allow its parent to evade withdrawal liability. Corporations, even parents and subsidiaries, are separate legal entities. *See Cent. States S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000). Thus, to deny the trustee access to work product would be to weaken the law firms' accountability to their own client.

■ A related principle also weighs against granting the law firms work product immunity in the present case. When the advice of counsel is at issue as, for example, where a party seeks to justify an action because it relied on such advice, work product immunity for documents containing that advice is overcome. *See, e.g., Panter v. Marshall Field & Co.*, 80 F.R.D. 718, 725 (N.D.Ill.1978). In the present case, the trustee's and Central States's concerns about the reason for the ANR merger have put the law firms' advice at issue. Thus, immunity should not apply for this reason as well. *See also Donovan v. Fitzsimmons*, 90 F.R.D. 583, 588 (N.D.Ill.1981) (finding that work product immunity should not apply when information was sought on behalf of beneficiaries of pension plan lawyers had represented because "advice of counsel" was a critical area of inquiry).

### F. Law Firms' Arguments

The law firms make a number of arguments as to why immunity should apply. I address each in turn.

#### 1. Circuit Precedent

First, they argue that decisions in this Circuit create a particularly broad authority in attorneys to assert work product immunity. However, a close reading of the two cases on which the firms rely indicates that neither helps them.

The law firms first cite *In re Special September 1978 Grand Jury*, which involved the performance of legal work by a Chicago law firm for a trade association that contributed heavily to candidates for public office. The law firm assisted in preparing reports to the Illinois State Board of Elections relating to the association's contributions. Prosecutors subpoenaed the law firm's records relating to the reports, prompting the law firm to resist the subpoena on work product grounds, among others. 640 F.2d at 53–54.

The Seventh Circuit concluded that because the association had been involved in on-going fraud in the filing of the elections reports, it had forfeited any rights it had as a client to invoke work product immunity. *Id.* at 63. While recognizing that the law firm could invoke the doctrine on its own behalf, the court stated:

> With respect to all information furnished to the attorney, whether transmitted in written form or communicated orally and recorded verbatim or in summary form, we conclude that the scale tips in favor of disclosure. We reach this result because we are persuaded that the strong policy disfavoring client fraud requires that the client relinquish the benefit he would gain from the work product doctrine, which benefit is just as real although it is his attorney, rather than he, who asserts the doctrine. We are

persuaded, however, that the attorney's mental impressions, conclusions, opinions, and legal theories must still be protected in order to avoid an invasion of the attorney's necessary privacy in his work, an invasion not justified by the misfortune of representing a fraudulent client. We therefore hold that the work product doctrine is waived for client fraud even when asserted by the attorney except that it is assertable to protect the attorney's mental impressions, conclusions, opinions, and legal theories about the case.

*Id.* at 63 (footnote omitted).

Notwithstanding the fact that the law firm was largely unsuccessful in asserting work product immunity in *Special Grand Jury*, appellants extract dicta from the court's decision and argue that it supports their position in the present case. They point to the court's statements that: "[O]ne of the purposes of the work product doctrine is to protect the work of the attorney from disclosure for the benefit of the attorney," *id.*; "the work product doctrine may be asserted by both the client and the attorney," *id.*; and, finally, "[t]he work product doctrine ... functions not merely and (perhaps) not mainly to assist the client in obtaining complete legal advice but in addition to establish a protected area in which the lawyer can prepare his case free from adversarial scrutiny," *id.* at 62.

However, there is a critical difference between *Special Grand Jury* and the present case. In that case, the law firm's assertion of immunity could reasonably be said to have strengthened rather than weakened the adversary system because, by invoking work product immunity, the law firm was attempting to benefit its client. By resisting the prosecutor's subpoena, the firm sought to prevent the dis-

covery of incriminating information about the client. By contrast, in the present case, the law firms are asserting work product immunity at the expense of their client's interests and are possibly preventing their client from discovering beneficial information. In short, *Special Grand Jury* differs from the present case because there the interests of attorney and client were aligned. Thus, the statements that appellants cite from *Special Grand Jury* were made in a context quite different from that in the present case. Moreover, the *Special Grand Jury* court made clear that work product immunity was not designed to shield a lawyer's work from his or her client, but rather from "adversarial scrutiny." *Id.* Finally, as noted, the court concluded in that case that the protection largely had to give way.

Appellants also rely on *First Wis. Mortgage Trust v. First Wis. Corp.*, 86 F.R.D. 160 (E.D.Wis.1980). The factual background of *First Wis. Mortgage Trust* is that, at one point in time, the Milwaukee law firm Foley and Lardner ("Foley") represented all four parties involved in litigation. *Id.* at 163. A dispute arose among the parties, and First Wisconsin Mortgage Trust ("the trust") terminated its relationship with Foley and brought a claim against the other three parties. *Id.* The court disqualified Foley from representing the remaining parties but granted its motion to preclude the trust from obtaining documents prepared by Foley in the course of its representation of the four parties. *Id.* In its decision, the court said that Foley had "some interest at least in the privacy of its own work product, independent of its client's position," *id.* at 167, and that a "lawyer's interest in the confidentiality of his own work product ... is in itself protectable," even possibly from his client, *id.* at 168.

However, *First Wis. Mortgage Trust* also differs from the present case in that the party seeking documents from Foley was a former client, which had become an adversary of other former clients and by implication of Foley itself. *See id.* at 164. Thus, *First Wis. Mortgage Trust* is best understood not as standing for the proposition that a lawyer's interest in work product trumps a client's but, rather, for the principle that the adversary system is not well served by requiring a lawyer to turn over documents to a former client who has become an adversary of other former clients.

## 2. Rule 26(b)(3)

█ The law firms also suggest that in order to obtain work product from them, the trustee should be required to make the showings required by Rule 26(b)(3). However, Rule 26(b)(3) was designed to address what an adverse party must establish to overcome work product immunity. It does not speak to the relative interests of a lawyer and his client in the lawyer's work product. Thus, the rule is inapplicable in the present case.

## 3. Property Interest

The law firms argue that an attorney should be regarded as having a property interest in work product. However, as I have indicated, the question of the respective interests of attorney and client in work product is best resolved by determining what result best serves the adversary system. Assigning the property interest label to either the lawyer's or the client's interest serves no useful purpose in the present context.

## 4. Chilling Effect

The law firms argue that requiring them to turn over work product would have a chilling effect on attorneys advising corpo-

rations on the verge of bankruptcy. However, assuming that a decision in favor of the trustee would have an effect on the behavior of lawyers, it is difficult to see how, from the standpoint of the adversary system, that effect could be negative. That a trustee would have access to material generated by counsel would encourage counsel to give better and more thoughtful advice, advice that contemplated all potential outcomes including bankruptcy. Moreover, the Supreme Court considered this issue in *Weintraub* and concluded that "the chilling effect is no greater here than in the case of a solvent corporation, where individual officers and directors always run the risk that successor management might waive the corporation's attorney-client privilege with respect to prior management's communications with counsel." 471 U.S. at 357, 105 S.Ct. 1986.

### 5. Potential Government Intrusion

Appellants also argue that because the trustee is appointed by a governmental body, affording him access to work product poses a risk of unwarranted intrusion by the state into an attorney's private matters. However, state appointed or not, under *Weintraub,* the trustee has succeeded to the rights of the law firms' former client. Moreover, it is unreasonable to think of a bankruptcy trustee as a kind of gestapo, and the law firms' concern in this regard seems to me overblown.

### G. Scope of Ruling

I emphasize that in concluding that the work product doctrine does not bar the trustee from access to documents possessed by the law firms, I am not fashioning a separate client interest in work product materials. Courts have sometimes felt compelled to create such an interest, but doing so is not faithful to the policies underlying the work product doctrine.

Anderson et al., *supra,* at 873. In its decision in the present case, the bankruptcy court stated that "[t]he purpose of the work product doctrine is to protect the client—not the attorney." *In re ANR Advance Transp. Co., Inc.,* 288 B.R. at 211. It is more accurate to say that the work product doctrine protects the attorney but does so only because such protection is necessary to enable the attorney to serve his or her client well and function effectively in an adversary system. Thus, although the rationale for my decision differs somewhat from that of the bankruptcy court, its order denying immunity will be affirmed.

### IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the bankruptcy court's order is **AFFIRMED,** and the matter is **REMANDED** to the bankruptcy court. On remand, the trustee should make a specific request of the law firms for the documents and/or information that he seeks. The fact that a particular document or piece of information may constitute attorney work product is not a ground for denying access to the trustee.